UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
COY HUGGINS,

                                  Petitioner,            **REPORT AND
                                                         RECOMMENDATION**

            - v -                                        CV 03-3248 (NG)(VVP)

RICHARD A. GIRDICK, SUPERINTENDENT
OF UPSTATE CORRECTIONAL FACILITY,

                                  Respondent.
---------------------------------------------------------------x

POHORELSKY, Magistrate Judge:

        Judge Gershon has referred to me for a Report and Recommendation, pursuant to 28

U.S.C. § 636(b)(1), Coy Huggins's petition for a writ of habeas corpus filed under 28 U.S.C. §

2254. The petition, which challenges his conviction on three counts of robbery in the first

degree, (*see* Pet. ¶ 4), asserts four grounds for relief: (1) denial of his right to counsel at a pre-

indictment lineup; (2) denial of due process of law because the prosecution failed to disclose

certain evidence in violation of *Brady v. Maryland* and its progeny; (3) denial of his right to

effective assistance of counsel; and (4) denial of his right to equal protection of the law when the

prosecution excluded certain females as jurors in violation of *Batson v. Kentucky* and its

progeny. For the reasons set forth below, the undersigned respectfully recommends that the

petition be DENIED.

## I. FACTS

        The following facts were adduced from transcripts of the petitioner's trial, the *voir dire*,

the pre-trial hearing, and the sentencing hearing, and from various exhibits contained in the

petitioner's and the respondent's submissions to state courts and this court.

## A. The Robbery

On April 12, 1996, at approximately two o'clock in the morning, Sina Sanchez, Melinda Sanchez, and Gabriel Padilla were returning home after spending the night at a local club.  (Trial Tr. pt. 4, at 157-59.)  They were riding in a black, 1995 Mitsubishi Galant, which was owned and being driven by Sina.  (*Id.* at 158.)  Sina intended to drop off Melinda and Gabriel at their apartment building located at 1112 Glenmore Avenue.  (*Id.* at 158-59.)  Upon arrival, Sina double-parked in front of 1112 Glenmore Avenue, underneath a lamp post located towards the rear of the car.  (*Id.* at 159-60.)  While Gabriel smoked a cigarette in the Galant and conversed with Sina and Melinda, he noticed the petitioner approach the car and observed the petitioner's face for approximately three seconds before the petitioner rolled a ski mask over his face.  (Trial Tr. pt. 6, at 342-43.)  However, before Gabriel could warn Sina and Melinda, Sina heard a clicking sound and, from the driver's side window, saw the petitioner in the ski mask point a gun to her head.  (Trial Tr. at 161.)

With the gun pointed at Sina's head, the petitioner said "Don't move or I'll shoot."  (*Id.* at 162.)  The petitioner also repeated a similar command to Gabriel.  (*Id.* at 163.)  As all three occupants prepared to leave the Galant, the petitioner instructed them to take off their jewelry and to leave the items on the floor of the car.  (*Id.* at 163.)  At the time, Sina was wearing a watch, bracelets, chains, and earrings.  (*Id.*)  After they removed their jewelry, the petitioner reached into the driver's side of the Galant, and grabbed Sina's arm.  He told her to get out of the car, and similarly instructed the other occupants to get out, walk away, and lay down.  (*Id.* at 163-64.) As all three occupants walked away, the petitioner drove off in the Galant.  (*Id.* at 164.)

Shortly before the robbery, Helen Padilla ("Helen"), Gabriel's sister-in-law, who also resided at 1112 Glenmore Avenue, went to the front of the apartment to "check on [her] car" because her father-in-law's car had recently been stolen.  (Trial Tr. pt. 7, at 547.)  Peering out the window of the first floor apartment, Helen observed the petitioner standing alone on Glenmore Avenue and "fidgeting."  (*Id.* at 548.)  Helen was also able to observe the petitioner's face, which was illuminated by the nearby lamp posts, for approximately ten minutes before the petitioner put on his ski mask.  (*Id.* at 550-51.)  Once Helen saw the petitioner approach the driver's side of the Galant and pull out a gun from his waistband she called 911.  (*Id.* at 552-53.)  While speaking to the 911 operator, Helen "didn't take [her] eyes off the window at all" and described the robbery to the 911 operator as it occurred.  (*Id.* at 554.)

## B.  The Arrest and Lineup

On April 13, 1996, the day after the robbery, Officers Lajoie and Hannel were on patrol in a marked vehicle when they received a "lojack signal" on their "lojack receiver."  (Trial Tr. pt. 5, at 219.)[1]  The lojack signal was being sent by the Galant as it was being driven down Hillside Avenue in Queens.  (*Id.*)  Based on the lojack signal, the police identified the Galant as a stolen vehicle, and proceeded to pull it over.  (*Id.* at 220-22.)  The petitioner was found in the back seat on the passenger side along with two other individuals.  (*Id.* at 223.)  After the occupants were removed from the car, Officer Lajoie recovered a black, 9 mm handgun in the back of the Galant, on the floor of the driver's side.  (*Id.* at 225.)  The police subsequently arrested the petitioner and the two other individuals.  (*Id.* at 235-36.)  In an inventory search of the Galant conducted at the

_____

[1]Officer Lajoie explained in his direct testimony that when a lojack receiver receives a lojack signal it registers a code which is then provided to the radio dispatcher for a description of the car that matches the code.  (*Id.*)

precinct, the police found a gold hoop earring that later proved to be Sina's in the rear of the car, on the floor of the passenger's side. (*Id.* at 242-43.) After his arrest, the petitioner and the other two individuals were taken to the 107th Precinct, (*id.* at 237), where they were met by Officer Norcia of the 75th Precinct's robbery investigation program (Pre-trial Hearing Tr. at 5). Officer Norcia interviewed one of the suspects, Monique Valrie, and released her. (*Id.* at 7.) The petitioner and the other suspect, Christopher Bright, were transported to the 75th Precinct for interviews and lineups. (*Id.*)

Once at the 75th Precinct, Officer Norcia sought to interview the petitioner, but after receiving his *Miranda* warnings the petitioner refused to talk to him without an attorney present. (*Id.* at 13.) Early the next day, around midnight, the petitioner was placed in a lineup for identification. (*Id.* 15-17.) Although Bright bore a closer resemblance to the description of the perpetrator provided by the complainants, Officer Norcia made a determination, based on various factors including the petitioner's extensive criminal record, that the petitioner should be placed in the lineup first. (*Id.* at 43-44.) Upon viewing the lineup in turn both Gabriel and Helen identified the petitioner as the one who had committed the robbery. (*Id.* at 18-20.) The petitioner was subsequently charged with various offenses under the New York Penal Law, including six counts of Robbery in the First Degree, N.Y. Penal Law §§ 265.02(2), (4), Robbery in the Second Degree, *id.* § 160.10(3), three counts of Robbery in the Third Degree, *id.* § 160.05, Grand Larceny in the Third Degree, *id.* § 155.35, four counts of Grand Larceny in the Fourth Degree, *id.* § 155.30(5), three counts of Petit Larceny, *id.* § 155.25, three counts of Menacing in the Second Degree, *id.* § 120.14(1), Criminal Possession of Stolen Property in the Fifth Degree, *id.* § 165.40, three counts of Criminal Possession of a Weapon in the Second Degree, *id.* §

265.03, Criminal Possession of a Weapon in the Third Degree, *id.* § 265.02(4), and Criminal Possession of a Weapon in the Fourth Degree, *id.* § 265.01(1). (Resp't Aff. Opp'n Habeas Corpus Pet. ["Resp't Aff."] ¶ 6.)

## C. Petitioner's Trial and Sentencing

In June 1997, a jury found the petitioner guilty of three counts of robbery in the first degree. (Trial Tr. pt. 8, at 743-44.) As a two-time violent felony offender, the petitioner was sentenced to consecutive terms of twelve years for each count, for a total sentence of thirty-six years. (Sentencing Tr. at 16-18.) As events during jury selection and two evidentiary issues underlie most of the petitioner's claims, the court briefly recounts their factual context below.

### 1. *Jury Selection*

During *voir dire*, counsel for the petitioner made a *Batson* challenge against the prosecution's peremptory strikes of eight prospective jurors on the ground that they were excluded solely because they were females under the age of 45. (*See* Voir Dire Tr. at 182.)[2] After arguments were made by both sides in conformance with *Batson*, two of the eight were excused on consent by both parties. Of the remaining six, the trial judge accepted the prosecution's gender-neutral explanations as to three, who were excused, but rejected the explanations as to two, who therefore remained on the jury. As to the final juror, although the trial judge did not find any *Batson* violation, the court ruled that she would remain on the jury as a remedy, agreed to by the petitioner's counsel, for the prosecution's previous violations of *Batson*. (*See* Voir Dire Tr. at 201-05.) As a result of the trial court's rulings, then, the petitioner

---

[2]Earlier in voir dire, counsel for the petitioner attempted to base his *Batson* challenge on the ground that the prosecution had excluded "*minority* females under the age of 45." (Voir Dire Tr. at 169) (emphasis added). However, after a conference in the trial judge's chambers, counsel for the petitioner changed the ground for the *Batson* challenge to "females under the age of 45." (*Id.* at 182.)

was denied three jurors, Mses. Martin, Bishop, and Kao, who he contended were improperly excluded.

### 2. *The Location of Helen Padilla's Bedroom*

A discrepancy arose at trial as to the location within 1112 Glenmore Avenue from which Helen observed the petitioner while calling 911. Helen testified that she was at the "front" of 1112 Glenmore Avenue when she observed the petitioner commit the robbery, and that "the front of the apartment [was her] bedroom." (Trial Tr. pt. 7, at 547.) Her brother-in-law, Gabriel, testified that the front of 1112 Glenmore Avenue faces Glenmore Avenue, the street on which the robbery occurred. (Trial Tr. pt. 6, at 320.) Gabriel also testified on cross-examination that the bedroom occupied by Helen and his brother was located at the back of the apartment. (*Id.* at 319-20.) Neither party sought to resolve the discrepancy between Helen's testimony that her bedroom was at the front of the apartment and Gabriel's testimony that it was at the back.

### 3. *The Sprint Report*

The police department generated a "Sprint Report"[3] as a result of the 911 call placed by Helen to report the robberies. (*See* Huggins Aff. Supp. § 440.10 Mot. Ex. 2, 3 ["Huggins § 440.10 Aff."]). The report was not introduced into evidence at the petitioner's trial. After sentencing, however, the petitioner obtained a redacted copy of the Sprint report through a request under New York's Freedom of Information Law (FOIL), N.Y. Pub. Off. Law §§ 84, *et.*

---

[3]"A 'Sprint' report is a report generated by the police department whenever a 911 call is made. It is a coded transcription reflecting the content of the call and the nature and content of any police radio transmissions made in connection with the call." (Resp't Mem. Opp. Habeas Corpus Pet. ["Resp't Mem."] at 4.) Other courts in this circuit have described a Sprint report as a "memorializ[ation] [of] statements made to [a] 911 operator," *Anthony v. City of New York*, No. 00-CV-4688, 2001 WL 741743, at *4 (S.D.N.Y. July 2, 2001), and as a "police document containing a synopsis of a 911 call," *Bonilla v. Portuondo*, No. 00-CIV-2369, 2004 WL 350694, at *8 n.6 (S.D.N.Y. Feb. 26, 2004).

*seq.*[4]  Among other things, the Sprint report states that the 911 call notifying the police of the robbery involving the petitioner originated from 1111 Glenmore Avenue as opposed to 1112 Glenmore Avenue, as testified to by Helen.  (*Compare* Huggins Aff. Supp. § 440 Mot. Ex. 3. *with* Trial Tr. at 546.)

## II. PETITIONER'S POST-CONVICTION MOTIONS AND DIRECT APPEAL

The petitioner challenged his conviction in the state courts by filing two motions in Kings County Supreme Court to vacate his conviction, and by filing a direct appeal to the Appellate Division, Second Department.  (Pet. ¶¶ 9-11.)  His first motion, made prior to sentencing, sought to vacate his conviction under New York Criminal Procedure Law § 330.30 ( the "§ 330.30 motion"), alleging that the prosecution's failure to turn over the Sprint report amounted to a constitutional violation under *Brady v. Maryland,* 373 U.S. 83 (1963) and *People v. Rosario,* 9 N.Y.2d 286 (1961).  (Pet. ¶ 11.)  On or around June 8, 1998, the Supreme Court denied this motion, finding that defense counsel had failed to preserve the issue of disclosure of the Sprint report for appeal.  (*See* Rivera Mem. at 1-2.)  When the petitioner sought the advice of appellate counsel to appeal his denial, counsel advised him that the Appellate Division would not consider his *Brady* claim because the issue had not been properly preserved for appeal.  (Pet. ¶ 11.) Pursuant to this advice, the petitioner did not pursue an appeal of the trial court's denial of his § 330.30 motion.  (*Id.*)

---

[4] At the sentencing hearing, the petitioner's attorney requested a copy of the Sprint report from the prosecution, and the judge ordered that the report be turned over to the petitioner's counsel with certain redactions.  (Sentencing Tr. at 4-5.)  The record does not disclose whether the petitioner's counsel ever received the report, and if he did, whether he provided it to the petitioner.  Although it is unclear exactly when the petitioner received the Sprint report, the report was the basis of the petitioner's § 330.30 motion, which the trial judge denied in a memorandum dated June 8, 1998.  (*See* Sentencing Tr. at 4; Rivera, J., Mem., June 8, 1998, at 1 ["Rivera Mem."].)

The petitioner then filed a direct appeal in the Appellate Division, Second Department, asserting two grounds: (1) that the trial court improperly denied his *Batson* challenge with respect to two prospective jurors during *voir dire* and (2) that the trial court should have suppressed the witness identification of the petitioner as the product of an unduly suggestive lineup. (*See, e.g.*, Appellant's Br. at 1.) On or about March 18, 2002, the Appellate Division found that both of the petitioner's claims lacked merit and affirmed his conviction. *Huggins,* 739 N.Y.S.2d at 733. The petitioner subsequently applied for, but was denied leave to appeal the decision of the Appellate Division to the New York Court of Appeals. *See People v. Huggins*, 98 N.Y.2d 676 (2002) (unpublished table decision).

In April 2002, the petitioner filed a second motion to vacate his conviction, this time under New York Criminal Procedure Law § 440.10 ( the "§ 440.10 motion"). (*See* Huggins Aff. Supp. § 440.10 Mot.) In his § 440.10 motion, the petitioner renewed his allegation that (1) the prosecutor's failure to turn over the Sprint report was a constitutional violation under *Brady* and *Rosario*; in addition, the petitioner claimed that (2) his counsel had been ineffective by failing to preserve for appeal the issue of the prosecutor's failure to disclose the Sprint report and (3) that he was wrongfully denied counsel at his pre-indictment lineup. (*Id.*) In August 2002, Justice John M. Leventhal of the King's County Supreme Court denied the petitioner's § 440.10 motion. (*See* Leventhal, J., Op., at 3, Aug. 6, 2002 ["Leventhal Op."].) Justice Leventhal found the Sprint report and right to counsel claims procedurally barred, ruling specifically that (1) the Sprint report claim was procedurally barred under section 440.10(3)(b) of the New York Criminal Procedure Law as having been decided on the merits in a previous motion, and (2) the right to counsel claim was procedurally barred under section 440.10(3)(a) of the New York

Criminal Procedure Law since the petitioner 'failed to make [the claim] appear on the record . . . .'" (Leventhal Op. at 3-4.)  The existence of procedural bars notwithstanding, Justice Leventhal addressed the merits of each claim and found them meritless.  Justice Leventhal rejected the petitioner's contention that the prosecution's failure to turn over the Sprint report impaired his ability to adequately prepare for trial, since "the [prosecution] timely turned over, and [the petitioner] received, a tape recording of the 911 call." (*Id.* at 3.)  As for the right to counsel claim, Judge Leventhal agreed with the petitioner that "for the purpose of an investigatory lineup, a law enforcement agency is required to honor an accused's request that counsel, whom he has retained for the purpose of the lineup, or related matter, be present." (*Id.* at 4.)  However, Justice Leventhal found "[the petitioner] was not represented by counsel in any matter at the time of the investigatory lineup," and thus, rejected the petitioner's right to counsel claim on its merits.  (*Id.*)  The Appellate Division, Second Department, denied the petitioner's subsequent application for leave to review the Supreme Court's denial of the §440.10 motion.  (*See* Schmidt, J., Order, No. 2002-07895, Dec. 9, 2002.)

## III.  THE PETITION BEFORE THE COURT

On or around June 20, 2003, the petitioner filed the instant petition for a writ of habeas corpus.  The petitioner makes four claims in support of his habeas petition, arguing that he was denied various constitutional rights: (1) the right to counsel when he was not provided access to an attorney at his pre-indictment lineup; (2) the right to constitutional due process as provided in *Brady v. Maryland* and its progeny when the prosecution failed to disclose certain exculpatory or impeachment evidence, (3) the right to effective assistance of counsel at trial; and (4) the right to equal protection of the law as provided in *Batson v. Kentucky* and its progeny by the

prosecution's exclusion of certain prospective jurors on the ground that they were females under the age of 45.  (Pet. ¶ 12.)

## IV.  STANDARD OF REVIEW

A federal court may entertain a petition for writ of habeas corpus by a petitioner in state custody only if the petitioner is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires that federal courts apply a deferential standard of review for habeas claims that have been adjudicated on the merits in state courts. *See* 28 U.S.C. § 2254(d); *see also Eze v. Senkowski*, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.' ") (quoting *Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir. 2001)) (additional citation omitted).  Under this narrow scope of review, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was adjudicated on the merits in State court only if it concludes that the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  *Accord Rosa v. McCray*, 396 F.3d 210, 219 (2d Cir. 2005); *Castro v. Lewis*, No. 03-CV-5480, 2004 WL 2418319, at *2 (E.D.N.Y. Oct. 29, 2004) (Gleeson, J.) ("The Antiterrorism and Effective Death Penalty Act . . . has narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits.") (citing 28 U.S.C § 2254(d)).  Furthermore, "[a] state court adjudicates a claim 'on the merits' for purposes of §

2254(d) when it '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment . . . even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.' " *Serrano v. Fischer*, 412 F.3d 292, 296 (2d Cir. 2005) (quoting *Gutierrez v. McGinnis*, 389 F.3d 300, 304 (2d Cir. 2004)).

## V. STATE COURT EXHAUSTION

The exhaustion requirement is codified under 28 U.S.C § 2254(b)(1)(A), and extends to every federal habeas claim alleged by the petitioner. *See Caballero v. Keane,* 42 F.3d 738, 740 (2d Cir. 1994). The exhaustion requirement prohibits the granting of an application for a writ of habeas corpus unless the petitioner has exhausted the remedies available in the courts of the state in which he or she was convicted. *See* 28 U.S.C § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981). This, in turn, "requires . . . that state prisoners give state courts a *fair* opportunity to act on their claims." *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (citing 28 U.S.C. § 2254(c)) (additional citations omitted). Thus, a petitioner is not deemed to have exhausted the available state remedies if he or she has the right under state law to raise, by any procedure, the question presented. 28 U.S.C. § 2254(c). This has been interpreted by the Supreme Court to require the invocation of "one complete round of the State's established appellate review process," including an application to "a state court of last resort when that court has discretionary control over its docket." *O'Sullivan*, 526 U.S. at 843, 845.

Moreover, the exhaustion requirement is not satisfied until the petitioner has "fairly presented" the federal claim to the highest court of the state. *See Picard,* 404 U.S. at 275 ("We emphasize that [for purposes of exhaustion] the federal claim must be fairly presented to the state

courts."). A claim may be "fairly presented" to the state courts if "the legal basis of the claim made in state court was the 'substantial equivalent' of that of the habeas claim." *Daye*, 696 F.2d at 192 (quoting *Picard*, 404 U.S. at 278) (additional citations omitted). "This means, in essence, that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.*

All of the petitioner's claims except for the ineffective assistance of counsel claim[5] are properly exhausted in accordance with the above framework. As to the unexhausted ineffective assistance claim, this court may nevertheless review the claim because 28 U.S.C. § 2254(b)(2) permits courts to address the merits of a habeas petition, despite non-exhaustion, if the inquiry results in a denial of the petition. The Second Circuit has not yet established a standard for allowing § 2254(b)(2) review. *See Brown v. State of New York*, 374 F. Supp. 2d 314, 318 (W.D.N.Y. 2005). The majority of courts in this circuit have followed a "patently frivolous" standard, *id.* (citing *Naranjo v. Filion*, No. 02-CIV-5449, 2003 WL 1900867, at *8 (S.D.N.Y. Apr. 16, 2003) (Peck, Mag. J.) (collecting cases)) (footnote omitted), while a minority of courts have exercised discretionary review, on the merits, of unexhausted claims, when " ' it is perfectly clear that the [petitioner] does not raise even a colorable federal claim,' " *see Hernandez v. Lord*, No. 00-CIV-2306, 2000 WL 1010975, at *4 n.8 (S.D.N.Y. July 21, 2000)

---

[5]For proper exhaustion, a petitioner must have set forth in state court all of the essential factual and legal premises asserted in his or her federal petition. *Picard,* 404 U.S. at 275. If material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim. *Id.* at 276; *Daye,* 696 F.2d at 191. Thus, if the petitioner has previously presented a claim to the state court, but presents additional facts to the federal court which materially alter the claim or crucially affect its determination, the petitioner must present this evidence to the state court before the federal court can consider the claim on its merits. *Picard,* 404 U.S. at 276; *Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir. 1991). Since the petitioner's ineffective assistance of counsel claim includes four grounds which were not presented to the state courts, that claim remains unexhausted. However, as discussed below, because the court recommends that the instant habeas petition be denied on its merits, review of the ineffective assistance claim is nonetheless proper.

(Peck, Mag. J.) (collecting and analyzing cases).  Because the petitioner's unexhausted

ineffective assistance of counsel claim, and indeed all of his claims, are both patently frivolous

and clearly meritless, the court will proceed to address the substance of the instant petition.

## VI.  ANALYSIS OF THE PETITIONER'S CLAIMS

### A.  Right to Counsel at the Pre-Indictment Lineup

#### 1.  *Procedural Bar*

As an initial matter, the petitioner's right to counsel claim is procedurally barred from

federal habeas review under *Coleman v. Thompson*, 501 U.S. 722 (1991) and *Grey v. Hoke*, 933

F.2d 117 (2d Cir. 1991).  Clearly established law prevents a federal habeas court from reviewing

federal claims if such claims were defaulted in state court on independent and adequate state

procedural grounds.  *See Coleman*, 501 U.S. at 730-32; *Grey*, 922 F.2d at 120-21.  If the

procedural bar applies, a habeas petitioner must "show cause for the procedural default and

prejudice resulting therefrom" in order for a federal court to review his barred claims.  *Grey*, 933

F.2d at 121; *see also Coleman*, 501 U.S. at 744-47.

Here, the record is absolutely clear that Justice Leventhal denied the petitioner's right to

counsel claim below because of the petitioner's unjustified failure to preserve an adequate

factual record at a pre-trial hearing during which matters relating to the pre-indictment lineup

were discussed.  (Leventhal Op. at 4.)  In doing so, Justice Leventhal cited New York Criminal

Procedure Law section 440.10(3)(a), which permits the dismissal of a §440.10 motion to vacate

judgment when a petitioner unjustifiably fails to preserve an adequate factual record sufficient

for appellate review of the ground or issue upon which the motion rests.  The petitioner's right to

counsel claim was thus defaulted on an independent and adequate state procedural ground.  *See,*

*e.g., Torres v. Stinson*, 93-CV-5310, 2000 WL 1919916, at * 7 (E.D.N.Y. Dec. 29, 2000) (finding procedural bar pursuant to state court denial of §440.10 motion because the petitioner failed to preserve adequate record as required under N.Y. Crim. P. Law § 440.10(3)(a)); *Nichols v. Kelly*, 923 F. Supp. 420, 424-25 (W.D.N.Y. 1996) (listing § 440.10(3)(a) as independent and adequate state ground sufficient for procedural bar). As the petitioner has not shown cause for the default, or prejudice resulting from the default, this claim affords no basis for habeas relief. *E.g., Grey*, 933 F.2d at 121.

2. *The Merits*

In any event, the petitioner's claim fails on the merits because he has no right to counsel at a pre-indictment lineup. *Kirby v. Illinois*, 406 U.S. 682, 687 (1972) (reaffirming that Fifth Amendment right to counsel is not applicable to pre-indictment lineups because the right against self-incrimination is not violated by the exhibition of physical characteristics); *People v. Hawkins*, 55 N.Y.2d 474, 486-87 (1982) (New York State Constitution provides no right to counsel at pre-indictment lineups).

There is of course a right to counsel under the Sixth Amendment if a lineup occurs after indictment. While there has been some disagreement as to when the right to counsel actually attaches because of differences in state indictment procedures, the actual initiation of adversary proceedings whether by way of formal charge, preliminary hearing, indictment, information, or arraignment must have occurred to give rise to the Sixth Amendment right to counsel. *Kirby*, 406 U.S. at 687. Federal courts look to state law to determine when the adversarial process is commenced for the purpose of evaluating when a criminal defendant's Sixth Amendment right to counsel attaches. *Meadows v. Kuhlmann,* 812 F.2d 72, 76-77 (2d Cir. 1987). Under New York

law, a criminal proceeding is initiated by either "(1) the filing of an accusatory instrument, (2) an arraignment, (3) an arrest warrant, or (4) a court removal order to transfer a prisoner to another location for the purpose of investigating a crime." *Taylor v. Kuhlmann*, 36 F. Supp. 2d 534, 548 (E.D.N.Y. 1999) (citations omitted). An accusatory instrument, as provided for in section 100.05 of the New York Criminal Procedure Law, may consist of, but is not limited to, an indictment or a felony complaint. *See* N.Y. Crim. P. Law § 100.05; *Hemphill*, 2004 WL 943567, at *8.

Here, the petitioner's Sixth Amendment right to counsel did not attach at the time of the investigatory lineup since formal proceedings had not been initiated against the petitioner by any of the above methods recognized under New York law. As the Supreme Court and the New York Court of Appeals have made clear, an arrest followed by an investigatory lineup, the precise situation the petitioner confronted, does not trigger the Sixth Amendment right to counsel. *Kirby*, 406 U.S. at 690; *Hawkins*, 55 N.Y.2d at 487. The petitioner therefore has no claim for habeas relief based on denial of counsel at his lineup.[6]

### B. Failure to Disclose the Sprint Report

The petitioner alleges that the prosecution's failure to disclose the Sprint report of Ms. Padilla's 911 call violated his constitutional rights because the report provided impeachment

---

[6]To the extent the petitioner seeks to rest his denial of counsel claim on a state-recognized right to counsel, any such claim fails for at least two reasons. First, "it is not the province of a federal court to reexamine state-court determinations of state-law questions." *Davis v. Strack*, 270 F.3d 111, 123 (2nd Cir. 2001). The court therefore cannot upset Justice Leventhal's determination that no state-recognized right to counsel was violated absent a finding that his determination violated some right guaranteed by the Fourteenth Amendment. *See id*. Second, the petitioner's claim rests on the factual contention that he had an open and still pending criminal matter involving some misdemeanor charges at the time the lineup was conducted. Justice Leventhal, however, made specific factual findings that the charges to which the petitioner referred were not open at the time of the lineup because the petitioner had pleaded guilty and had been sentenced on the misdemeanor offenses six weeks before the lineup, thus ending the matter entirely. (Leventhal Op. at 6-7.) This court has no basis to upset the factual findings of Judge Leventhal.

material that could have been used to attack the credibility of Ms. Padilla. The petitioner's claim thus falls under the subset of cases, within the ambit of *Brady v. Maryland*, 373 U.S. 83 (1963), which prescribe the prosecution's constitutional duty to disclose impeachment evidence. *See, e.g.*, *Strickler v. Greene,* 527 U.S. 263 (1999); *United States v. Bagley*, 473 U.S. 667 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972). Those cases require the disclosure of material impeachment evidence known to the prosecution, whether requested or not. *Strickler*, 527 U.S. at 280-81. Impeachment evidence is material, for purposes of *Brady* and its progeny, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *Bagley*, 473 U.S. at 682).

The petitioner's argument concerning the materiality of the Sprint report rests on a discrepancy between the Sprint report and Helen Padilla's testimony concerning her address when she made the 911 call, and on a discrepancy between Helen Padilla's testimony and the testimony of her brother-in-law about the location of Helen Padilla's bedroom at the address where she made the call. The Sprint report cites an anonymous caller who called from 1111 Glenmore Avenue, rather than 1112 Glenmore Avenue where Helen Padilla testified she placed the call. As to the bedroom from which Helen testified she observed the robberies and made the 911 call, Helen Padilla testified it was in the front of the apartment at 1112 Glenmore Avenue; her brother-in-law testified that her bedroom was in the back of the apartment. The petitioner argues that the discrepancy concerning the address listed in the Sprint report, when coupled with the discrepancy concerning the location of Helen Padilla's bedroom, could have cast doubt on Helen's testimony that she observed the robberies while making the 911 call.

In light of the other evidence concerning the petitioner's conviction, and in particular the actual tape recording of the 911 call which was introduced in evidence, the Sprint report does not constitute material evidence because there is no reasonable probability that its disclosure to the defense would have produced a different result at trial. Its only possible use as impeachment material is that, in light of the discrepancy in the address, the defense could seek to call into question whether Helen actually observed the robberies. In view of the contemporaneous tape recording of the 911 call, however, during which Helen disclosed to the 911 operator her observations concerning the robberies that were occurring, there is no serious dispute that she actually observed the robberies of the three victims. The discrepancy concerning the address is therefore immaterial.

Its immateriality is further demonstrated by the other evidence linking the petitioner to the crime. Specifically, the petitioner was identified at the pre-indictment lineup as the perpetrator by someone other than Helen Padilla, namely Gabriel Padilla, a victim of the crime. (Trial Tr. pt. 7, at 441.) In addition, when the petitioner was arrested he was riding in the stolen vehicle, which was later found to contain a black, .9 millimeter handgun, resembling the one used in the robbery, as well as a gold hoop earring belonging to another victim of the crime, Sina Sanchez. (Trial Tr. pt. 5, at 225, 243, 292.)

As the petitioner has failed to establish that the Sprint report constituted material impeachment evidence such that its disclosure would have raised a reasonable probability of a different result at his trial, this basis for habeas relief fails.

## C. The *Batson* Claim

The petitioner alleges a violation of his constitutional rights under *Batson v. Kentucky*, 476 U.S. 79 (1986) due to the prosecution's exclusion of women from the jury "based on employment and other factors." (Pet. ¶ 12(D)). In support this argument, the petitioner cites a single example of a woman stricken by the prosecutor on the ground that her employment at a detoxification center made her likely to be sympathetic to the defendant's situation. He does not otherwise challenge any specific strike made by the prosecutor or any *Batson* ruling made by the trial court. Although it is questionable whether the petition even states adequately a claim for relief under *Batson*, given the petitioner's pro se status the court will examine the three *Batson* rulings made by the trial court which may plausibly support a contention that the prosecution impermissibly excluded jurors on the basis of their gender.

*Batson* and its progeny have established that the state denies a defendant equal protection of the laws if it puts the defendant on trial before a jury from which members of his or her sex have been purposefully excluded. *See Batson v. Kentucky,* 476 U.S. 79, 85 (1986); *J.E.B. v. Alabama,* 511 U.S. 127 (1994) (extending *Batson* to forbid discrimination on the basis of gender during *voir dire*). The Supreme Court has established a three-step process for analyzing claims that a juror was excluded in a discriminatory manner in violation of the Equal Protection Clause. First, a party contesting a peremptory challenge of a prospective juror under *Batson* must establish a *prima facie* case that the nonmoving party's peremptory challenge was motivated by impermissible discrimination. *Batson,* 476 U.S. at 96-97.[7]

---

[7] For purposes of this decision the court will assume, without deciding, that the petitioner had established a *prima facie* case under the first *Batson* step since the trial court had already advanced to the second step of the *Batson* test. *See Hernandez v. New York*, 500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the

Once a *prima facie* case is established, the nonmoving party is afforded an opportunity to provide an alternate, lawful explanation for its peremptory challenge. *Batson*, 476 U.S. at 97-98. The Supreme Court has emphasized that the nonmoving party's burden in offering an alternate explanation is very low; although a permissible explanation for the peremptory challenge must be given, it need not be persuasive. *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (per curiam).

Finally, in the third step, the trial judge must determine whether the moving party carried its burden by a preponderance of the evidence, to show that the peremptory challenge at issue was in fact based on impermissible discrimination. *Batson,* 476 U.S. at 96-98. As the Supreme Court explained in *Hernandez*:

> Deference to trial court findings on the [third *Batson* step] makes particular sense . . . because . . . the finding 'largely will turn on evaluation of credibility.' [T]he decisive question will [typically] be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'

500 U.S. at 365 (citations omitted). Under this burden-shifting approach, the ultimate burden of persuasion rests with the party opposing the strike. *Purkett,* 514 U.S. at 768. Thus, the prosecution is not required, when challenged, to persuade the court that its permissible reasons for striking jurors are "valid or tactically sound; it is enough that they are the [prosecutor's] reasons." *United States v. Thomas,* 320 F.3d 315, 320 (2d Cir. 2003).

---

defendant had made a prima facie showing becomes moot."); *McKinney v. Artuz*, 326 F.3d 87, 98 (2d Cir. 2003) ("The Supreme Court has held that the prima facie case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third [*Batson*] steps . . . .") (citation omitted). The court notes, however, that the Appellate Division rejected the petitioner's *Batson* claim, finding, in part, that he had failed to establish a *prima facie* case. While the court does not necessarily agree with this finding, *see J.E.B.,* 511 U.S. at 143 ("[G]ender simply may not serve as a proxy for bias"), it need not decide the issue right now, as *Hernandez* makes clear.

With respect to the petitioner's *Batson* claim the court will review (1) the factual rulings of the trial court and (2) the judgment, on the merits, of the Appellate Division, under the rubric of section 2254(d), which authorizes habeas relief only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Green v. Travis*, 414 F.3d 288, 299 (2d Cir. 2005) (finding "[t]he Appellate Division's incorrect analysis of the facts constituting the heart of [the appellant's] Batson claim means that its holding cannot withstand . . . scrutiny under § 2254(d)(2).") (citation omitted); *Walker v. Girdich*, 410 F.3d 120, 124 (2d Cir. 2005) ("In view of the prosecutor's comments, the trial court's rejection of [the appellant's] *Batson* challenge 'involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' ") (citing 28 U.S.C. 2254(d)(1)).

Furthermore, in the context of federal habeas review, "[a] state court's determination whether a prosecutor's use of a peremptory challenge was motivated by discriminatory intent, in violation of *Batson*, is a factual determination and thus qualifies for [the 28 U.S.C. § 2254(e)] presumption of correctness." *Bryant v. Speckard*, 131 F.3d 1076, 1077 (2d Cir. 1997) (citations omitted); *see also* 28 U.S.C. § 2254(e)(1); *Purkett*, 514 U.S. at 769 ("[I]n habeas proceedings in federal courts, the factual findings of state courts are presumed to be correct, and may be set aside, absent procedural error, only if they are 'not fairly supported by the record.' ") (citations omitted). A petitioner seeking habeas relief has the burden of rebutting this presumption by clear and convincing evidence. 29 U.S.C § 2254(e)(1).

Below, the court applies the *Batson* analysis to the trial court's rulings on the three prospective jurors, Mses. Martin, Bishop, and Kao, who were excluded from the jury despite *Batson* challenges by the petitioner at trial.[8]

### 1. *Ms. Martin*

With respect to Ms. Martin, the prosecution offered as its gender-neutral explanation the fact that Ms. Martin's son had been convicted of and incarcerated for robbery, a charge similar to the one she would have had to deliberate upon had she become a member of the petitioner's jury. (Voir Dire Tr. at 187.) The trial court accepted this as a valid gender-neutral explanation for striking Ms. Martin and rejected the petitioner's *Batson* challenge. (*Id.* at 202.) The petitioner, in his habeas application, does not state the grounds upon which the trial court may have misapplied *Batson* in accepting the prosecution's gender-neutral explanation. Furthermore, the authority in this circuit is overwhelmingly clear that race or gender-neutral explanations based on the fact that a relative of a prospective juror had been arrested or convicted of a crime, is acceptable under *Batson*. *Green*, 414 F.3d at 300 (accepting as satisfactory race-neutral explanations by prosecutor fact that some prospective jurors had relatives who had been convicted of drug offenses); *Crenshaw v. Superintendent of Five Points Corr. Facility*, 372 F. Supp. 2d 361, 372 (W.D.N.Y. 2005) (finding the petitioner did not fulfill burden under third *Batson* step where prosecutor offered as race-neutral reason fact that prospective juror's brother had been convicted of a felony) (collecting cases); *Kassan Supreme Messiah v. Duncan*, No. 99-

---

[8]On direct appeal from his conviction, the petitioner challenged the trial court's *Batson* rulings with regard to Mses. Bishop and Kao. (Brief for Appellant at 11-15, *People v. Huggins*, No. 00-00313 (2d Dep't Apr. 2001)) The Appellate Division rejected the claim, finding that (1) the petitioner did not establish a prima facie case under the first *Batson* step; (2) "the prosecution advanced sufficient race-neutral [sic] explanations for exercising peremptory challenges against the two prospective jurors in question; and (3) the petitioner failed to carry his burden under the third step of *Batson*. *See, e.g., People v. Huggins*, 739 N.Y.S.2d 733 (App. Div. 2d Dep't 2002).

CIV-12178, 2004 WL 1924791, at *5 (S.D.N.Y. Aug. 27, 2004) (finding prosecution's race neutral explanation that prospective juror had been arrested and had four relatives in state prison sufficient to support trial court's rejection of the petitioner's *Batson* challenge); *Jordan v. Lefevre*, 22 F. Supp. 2d 259, 272 (S.D.N.Y. 1998) (stating that "a family member's criminal history is accepted as a race neutral explanation," in the context of a *Batson* challenge) (collecting cases), *rev'd in part* 306 F.3d 196 (2d Cir. 2000); *Barbara v. Goord*, No. CV-98-4569, 2001 WL 1776159, at *6 (E.D.N.Y. Dec. 27, 1991) ("Prosecutors routinely challenge [jurors whose family members had been recently prosecuted by the authorities], regardless of race, fearing bias against the authorities."); *cf. Pruitt v. McAdory*, 337 F.3d 921, 929-30 (7th Cir. 2003) (finding, as legitimate gender-neutral explanation, the fact that prospective jurors did not have past experience with crime). Thus, the court finds that the petitioner has failed to overcome the presumption of correctness accorded to the trial court's factual findings by clear and convincing evidence, and has also failed to establish that the judgment of the Appellate Division was contrary to or an unreasonable application of *Batson*.

2.     *Ms. Bishop*

With respect to Ms. Bishop, the prosecution offered the following gender-neutral explanation in accordance with step two of the *Batson* test:

> The predominant reason, Your Honor, [for striking Ms. Bishop] was based upon the fact she worked in a detox center. It has been my experience in the trials I have done that individuals, social workers and individuals who work with detox centers favor the defense side more often. She [Ms. Bishop] works with people with drug dependencies, and those people work with people with criminal records.

(Voir Dire Tr. at 189.)

Proceeding to the third *Batson* step, counsel for the petitioner responded with the following argument:

> I don't believe, first of all, [the prosecutor's] rationale is one that should be accepted or is even acceptable under the law in response to a Batson challenge. . . . She gave no indication that any of the persons she particularly works with have been arrested or convicted. She gave no indication as to what her political background would be, as though a social worker would be some sort of liberal that would feel for the defendant. In fact, she gave candid answers to all the questions she was asked by both [the prosecutor] and myself, and I think if I were relying upon merely the fact she works in the detox office, I think [the prosecutor] is grabbing for straws with regards to a peremptory challenge.

(*Id*. at 196.)

The trial court ultimately ruled in favor of the prosecution, finding that its gender-neutral explanation was "not pretextual in nature." (*Id.* at 202.)

This ruling is acceptable and the petitioner does not prove otherwise under the rigorous standards for habeas review. Courts in this circuit have found a prospective juror's employment, which the prosecution believes may result in sympathy toward the defendant, as a legitimate basis for a race or gender-neutral explanation. *See Duncan*, 2004 WL 1924791, at *5 (finding a trial court's factual determination in accepting race-neutral explanation not clearly erroneous where prosecutor may have believed that prospective juror's social work background would cause him to be sympathetic to defendant); *Stays v. Herbert*, No. 01-CV-2400, 2003 WL 22765352, at *5 (E.D.N.Y. Nov. 24, 2003) (finding legitimate race-neutral explanation based on juror's occupation as a home health aide which made her more sympathetic) (citing *United States v. Alvarado*, 951 F.2d 22, 25 (2d Cir. 1991)). Furthermore, the petitioner has neither offered any contrary authority nor indicated the reasons for which the prosecution's employment-based rationale would not constitute a gender-neutral explanation sufficient to repel

a *Batson* challenge. Accordingly, the court finds that the petitioner has failed to overcome the presumption of correctness accorded to the trial court's factual findings by clear and convincing evidence, and has also failed to establish that the judgment of the Appellate Division was contrary to or an unreasonable application of *Batson*.

          3.     *Ms. Kao*

With respect to Ms. Kao, the following colloquy, in relation to the second *Batson* step, took place between the prosecutor and trial court:

| | |
|---|---|
| [The Prosecutor]: | The reason the people struck Ms. Kao was because I could not understand any of the responses that she was giving your Honor. In fact, I started off the record, I believe at the close of court that day, that I was amazed you were able to interpret her well. |
| The Court: | You did say that and she did have a very heavy, heavy Asian accent. I am unable to tell from which country. It was somewhat difficult for me to ascertain what she was saying, but apparently I was a little better able to do so than you did, counsel. |
| [The Prosecutor]: | I could not understand what was being said by her. In fact, I have very little down here. It was based upon that, I had a problem understanding her and I think here may have been a language problem going the other way. It was based upon that that the People used the challenge for juror number 12, Ms. Kao. |

(Voir Dire Tr. at 192.)

Proceeding to the third *Batson* step, while counsel for the petitioner acknowledged Ms. Kao's difficulty with English, he stated the following as proof of the prosecution's purposeful discrimination in striking Ms. Kao:

With respect to Ms. Kao, your Honor, I can't argue the fact because [the prosecutor] and I did discuss, off the record, what notations we had with respect to her responses and whether or not we heard her, but I don't really necessarily

think that that's a reason to exclude somebody, because what we need to know is whether or not that person can understand and comprehend the evidence that is presented here at trial. Although we are sitting at a distance and she has a low voice, she gave no answer or reasons to believe she did not understand each and every question your Honor asked and each and every question [the prosecutor] asked. She was one of the few people I believe that went through the questionnaire without asking your Honor to repeat the questions. . . . Yes, it is important that a juror be able to communicate with other jurors if they are going to sit on a case, but there is no reason to believe if she was selected she could not participate in the deliberation process and that other people could not understand her if they were sitting in the room and listening to her attentively. I do not believe that reason was sufficient based on this Batson challenge.

(*Id.* at 199.)

After due consideration, the trial court accepted the prosecution's gender-neutral explanation of striking Ms. Kao as a potential juror, and stated the following:

With regards to juror Kao, notwithstanding [defense counsel's] argument as to pretext, I find that the reason advanced by [the prosecution] was non-pretextual in nature. It is essential for the deliberating process of the jury, that a juror be not only able to understand what the other jurors are conveying in the process of deliberations, but that the juror be also able to express and be understood by the other jurors. I find that the proffered reason advanced by [the prosecution] was non-pretextual in nature.

(*Id.* at 204.)

In the instant habeas application, the petitioner neglects to identify any additional reasons to buttress his claim that the prosecution violated the principles of *Batson* in striking Ms. Kao. Moreover, this court is in agreement with previous rulings in this circuit which have considered the issue, finding that a prospective juror's language difficulty may constitute a legitimate race or gender-neutral explanation under *Batson* and its progeny. *See, e.g.*, *United States v. Taylor*, 92 F.3d 1313, 1330 (2d Cir. 1996) (affirming the determinations of the Magistrate, subsequently reviewed and accepted by Judge Korman, that government's race-neutral explanation of prospective juror's "inability to understand testimony and make herself understood in the jury

room..." was not overcome by defendants in the third *Batson* step); *Alvarado*, 951 F.2d at 25 (affirming the Magistrate's acceptance of the government's race-neutral explanation of "arguable language difficulty" with respect to prospective juror). Thus, the court finds that the petitioner has failed to overcome the presumption of correctness accorded to the trial court's factual findings by clear and convincing evidence, and has also failed to establish that the judgment of the Appellate Division was contrary to or an unreasonable application of *Batson*.

In finding the petitioner's *Batson* claim meritless, the court recognizes that the bar the petitioner must overcome is, indeed, a high one. However, it is there for good reason and not entirely insurmountable.[9] Thus, it is important to re-emphasize that, as a reviewing court, " 'appropriate deference' " must be accorded to the trial court's factual findings under the third *Batson* step. *Alvarado*, 951 F.2d at 25 (quoting *Batson*, 476 U.S. at 98 n.21); *see also Hernandez*, 500 U.S. at 365; *Francis*, 2004 WL 1878796, at *15 ("[T]rial court's findings [under third *Batson* step] is ... afforded great deference by a reviewing court."). Since the *Batson* inquiries as to Mses. Martin, Bishop, and Kao were extremely fact-sensitive this court must defer to the findings of the trial court. Moreover, the presumption of correctness accorded on federal habeas review to a state court's factual findings must be rebutted by the petitioner with clear and convincing evidence. *See* 29 U.S.C. § 2254(e)(1). The petitioner has not satisfied this burden of proof.

---

[9] *See, e.g.*, *Walker*, 410 F.3d at 124 (reversing lower court's denial of habeas petition where trial court committed habeas-level error as to a *Batson* challenge); *Weddell v. Weber*, 290 F. Supp. 2d 1011 (D.S.D. 2003) (granting habeas petition based in part on *Batson* violation); *Morrison v. Jones*, 952 F. Supp. 729 (M.D. Ala. 1996) (granting habeas petition where prosecution failed to rebut prima facie case of discrimination arising from its striking twenty of twenty-one black venire members).

### D. Ineffective Assistance of Trial Counsel

The Sixth Amendment requires that a criminal defendant have effective assistance of counsel for his or her defense. *Strickland v. Washington,* 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). The benchmark for judging effectiveness of counsel is whether counsel's conduct undermined the proper functioning of the adversarial process to the point that the trial cannot be relied on as having produced a just result. *Id.* at 686. To prevail on an ineffective assistance claim, a petitioner must establish (1) that counsel's representation fell below an objective standard of reasonableness measured by prevailing professional norms, and (2) that there is a reasonable probability that but for counsel's errors the result of the proceeding would have been different. *Id.* at 688-694; *United States v. Eyman,* 313 F.3d 741, 743 (2d Cir. 2002). As the Second Circuit observed, "the *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir. 2001).

In evaluating an ineffective assistance of counsel claim under the performance prong of *Strickland,* the court is mindful of Justice O'Connor's admonition that "it is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 466 U.S. at 689 (citation omitted). Thus, "[the] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and the petitioner "must

overcome the presumption that, under the circumstances, the challenged action 'might not be considered sound trial strategy.' " *Id.* (citation omitted).

In evaluating an ineffective assistance of counsel claim under the prejudice prong of *Strickland,* the court must determine whether the petitioner has shown prejudice of constitutional proportions, which, as recognized in this circuit, "lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.' " *Lindstat,* 239 F.3d at 204. Furthermore, in determining the level of prejudice suffered by the petitioner, if any, the court considers the prejudicial effect of not one or another of the errors alleged by the petitioner, but measures the cumulative weight of error to determine whether the prejudice reaches the constitutional threshold warranting habeas relief.[10] *Id.* at 198-99.

Lastly, it is important to bear in mind that the present case is before the court on habeas review. That distinction is significant since, as the Second Circuit recently emphasized, "a [habeas] petitioner whose claim is that he received ineffective assistance of counsel not only must satisfy the *Strickland* standard but also must show that the state court's rejection of his claim either was contrary to Strickland or was an unreasonable application of Strickland." *Henry v. Poole,* 409 F.3d 48, 68 (2d Cir. 2005) (citations omitted).

As discussed above, the petitioner grounds his ineffective assistance of counsel claim on counsel's failure (1) to call, as a witness at trial, Christopher Bright, the individual found and arrested with the petitioner in the Galant the day after the robbery, (2) to cross-examine Helen Padilla about the location of her bedroom where she made the 911 call, (3) to obtain or

---

[10] The performance and prejudice prongs may be addressed in either order, and if it is apparent that an ineffectiveness claim must be disposed on the ground of a lack of sufficient prejudice, that course should be followed. *Strickland,* 466 U.S. at 697. Thus, if a petitioner fails to satisfy the prejudice prong of *Strickland,* it is unnecessary to consider the performance prong. *Id.*

investigate the allegedly exculpatory Sprint report, and (4) to call, as a witness at trial, the 911 operator who fielded Helen Padilla's 911 call.  (Pet. ¶ 12(C).)  The court will address each ground in turn.

### 1. *The Failure to Call Christopher Bright as a Witness At Trial*

The petitioner contends that had counsel called Christopher Bright as a witness and presented to the jury an official comparison of Bright's height and weight with that of the petitioner, counsel could have instilled reasonable doubt within the jurors' minds that the petitioner was the one who committed the robbery.  (Pet. ¶ 12(C).)  The complainants provided the police with a description of the perpetrator as a black male, five feet, ten inches tall and 200 pounds.  (Pre-Trial Hearing Tr. at 25-26; Trial Tr. pt. 7, at 453.)  Bright, in fact, matched this description as the pedigree information he gave to the police described him as five feet, ten inches tall and 200 pounds.  (Pre-Trial Hearing Tr. at 25-26; Trial Tr. at 456-57.)  The petitioner, however, provided the police with pedigree information indicating that he was six feet, three inches tall and 250 pounds.  (Pre-Trial Hearing Tr. at 26; Trial Tr. at 458.)  The petitioner argues that had counsel demonstrated this disparity to the jury physically by conducting and comparing the measurements of Bright and the petitioner before the jurors, the trial verdict would have been different.  The court finds this ground to be meritless.

Contrary to the petitioner's suggestion, counsel for Petitioner had indeed explored this avenue in exhaustive detail with his cross-examination of Officer Norcia.  (*See* Trial Tr. at 455-62.)  Specifically, counsel questioned Officer Norcia on his rationale for placing the petitioner in the lineup first, despite the fact that Bright bore a greater similarity to the description of the perpetrator provided by the complainants.  (*Id.*)  Thus, counsel elicited through testimony and for

the benefit of the jurors the same facts that the petitioner asserts should have been shown directly to the jurors by a physical comparison.  And, in the court's view, counsel's strategy to proceed by means of testimonial rather than physical evidence is entirely sound.  This, compounded with the oft-repeated admonition that, in the context of ineffective assistance claims, "the decision to call or bypass particular witnesses is peculiarly a question of trial strategy, which courts will practically never second-guess,"  *Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974), requires the court to reject the instant ground the petitioner uses to support his ineffective assistance claim.

2. *The Failure to Cross-Examine Helen Padilla About the Location of Her Bedroom*

The petitioner contends that counsel was ineffective for not questioning Helen Padilla about the exact location of her bedroom within the apartment.  (Pet. ¶ 12(C).)  In particular, the petitioner claims that counsel could have used Gabriel Padilla's testimony to impeach Helen's testimony that she was at the front – as opposed to the back – of her apartment on 1112 Glenmore Avenue when she observed the crime in progress.  (*Id.*)  Gabriel, who resided in the basement apartment below Helen's at 1112 Glenmore Avenue, testified that Helen's bedroom was located at the back of the apartment.  (Trial Tr. pt. 6, at 319-20.)  Helen testified later at trial, however, that "the front of the apartment is my bedroom" and that she was looking out from the front window of the apartment when the robbery took place.  (*Id.* at 547.)  Thus, the petitioner argues that his counsel's failure to question Helen about this discrepancy was "negligent."  (Pet. ¶ 12(C).)[11]

---

[11]The petitioner couches his argument as a failure by his counsel to re-call Helen to the stand after Gabriel had testified that her bedroom was at the back of the apartment.  In fact, Helen was not called to testify until *after* Gabriel had testified, and the petitioner's counsel thus had the opportunity to question her about the discrepancy but chose not to.

Courts in this circuit have consistently found trial counsels' decisions whether or not to call or cross-examine a witness, and the scope of such any cross-examination, to be tactical decisions, falling within the ambit of trial strategy. *Quinones v. Miller*, No. 01-CIV-10752, 2003 WL 21276429, at *41 (Peck, Mag. J.) (S.D.N.Y. June 3, 2003) (collecting cases); *United States v. DeFeo*, No. 90-CR-250, 1997 WL 3259, at *15 (S.D.N.Y. Jan. 6, 1997) (citing *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)). As such, they are generally not meritorious grounds for ineffective assistance of counsel claims. *DeFeo*, 1997 WL 3259, at *15 (citations omitted).

Here, counsel's decision not to question Helen about the location of her bedroom clearly constitutes a tactical decision, well within the strong presumption of adherence to reasonable professional norms accorded to trial counsel by *Strickland* and its progeny. *See Strickland*, 466 U.S. at 689. Counsel sought to exploit the discrepancy between her testimony and Gabriel's testimony on that point in his closing argument, using it to cast doubt on Helen's credibility and opportunity to view the robbery. Trial Tr., pt. 8, at 671. Had he questioned Helen closely about the matter, he ran the risk that the discrepancy would be cleared up in a manner that would further credit Helen's testimony regarding the petitioner's guilt.[12] The role of defense counsel is to cast doubt on the prosecution's case, not to resolve factual discrepancies that tend to create

_____

[12]A close reading of Gabriel's testimony reveals that the discrepancy arose because of a semantical difference between Gabriel and Helen as to what constituted the "front" versus the "back" of the apartment. *See* Tr., pt. 6, at 319-20. Thus, Gabriel says his brother's (and Helen's) bedroom "is in the back, the last room *where the window is at*." *Id*. at 319:7-8 (emphasis added). When asked a short time later whether the back bedroom faces the North Conduit, as opposed to Glenmore Avenue, Gabriel unequivocally says, "No, it does not." *Id*. at 319:23. A fair reading of Helen's and Gabriel's testimony taken together is that, although Helen's bedroom was at the *front* of the building (and thus faced Glenmore Avenue) as Helen testified, it was at the *back* of the apartment as far as Gabriel was concerned. Or, to put it another way, from Gabriel's standpoint the back of the apartment was at the front of the building.

such doubt.  Thus, once the discrepancy had arisen, it was a sound strategic decision *not* to question Helen further in an attempt to clear it up, but rather to exploit it, as counsel did.  As such, it constituted exemplary, rather than constitutionally deficient, performance.

3.    *Counsel's Failure to Introduce the Sprint Report and to Call the 911 Operator as a Witness at Trial*

The petitioner contends that had counsel obtained and investigated the Sprint report, and then called the 911 operator who fielded Helen's call to testify at trial, credibility would have been cast on Helen's testimony that she witnessed the robbery.  As noted above, the Sprint report indicates that the 911 call was made by an anonymous female and originated from 1111 Glenmore Avenue, rather than 1112 Glenmore Avenue which is where Helen testified she made the call. (Pet. ¶ 12(C).)  There is little chance, however, that exposing this minor discrepancy would have changed the trial verdict.  *See, e.g.*, *Hemphill v. Senkowski*, No. 02-CIV-7093, 2004 WL 943567, at *8 (S.D.N.Y. May 3, 2004) (rejecting habeas petitioner's claim that prosecution's failure to disclose Sprint reports was a *Brady* violation since they were not material and would not have changed the trial verdict).  The fact remains that Helen saw the robbery take place on Glenmore Avenue, a point the petitioner's counsel wisely chose not to contest considering that a contemporaneous recording of Helen's 911 call was made and introduced into evidence at the petitioner's trial.  Exposure of the one-digit discrepancy between the address reflected in the Sprint report and Helen's testimony about where she was could not alter the fact that the call was made and that Helen's voice was on the recording.  The failure to obtain and introduce the Sprint report, and the failure to call the 911 operator to establish the one-digit address discrepancy thus was of no consequence.

In sum, the petitioner has failed to overcome the strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. The deficiencies cited by the petitioner were either sound trial strategy or had no reasonably probability of affecting the outcome. Accordingly, the petitioner's ineffective assistance claim should be rejected on all grounds.

## CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that the petitioner's habeas corpus petition be DENIED in all respects. Since the petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability should not issue. *See* 28 U.S.C. § 2253(c)(2).

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court with a copy to the undersigned within ten days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.), *cert. denied,* 113 S. Ct. 825 (1992), *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated:          Brooklyn, New York
                January 2, 2007

-33-